IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| IN RE: § | |
| EL PASO CHILDREN'S HOSPITAL § | |
| CORPORATION, § | CASE NO. 15-30784 |
| DEBTOR. § | CHAPTER 11 |
| § | |
| EIN: 26-3075429 § | |
| § | |
| 4845 ALAMEDA AVENUE § | |
| EL PASO, TEXAS 79905 § | |

**DECLARATION OF MARK HERBERS, CHIEF EXECUTIVE
OFFICER AND CHIEF RESTRUCTURING OFFICER OF EL PASO
CHILDREN'S HOSPITAL CORPORATION, IN SUPPORT OF FIRST DAY MOTIONS**

My name is Mark Herbers. I am competent to testify about the following matters:

1. "I am the Chief Executive Officer and Chief Restructuring Officer of El Paso Children's Hospital Corporation ("Children's Hospital" and/or "Debtor"). I am familiar with the day-to-day operations, business, and financial affairs of the Debtor, as debtor, and debtor-in-possession. As the Debtor's CEO and CRO, I am responsible for management of the Debtor, and I serve as an integral member of the Debtor's senior management team. I have been serving in such role since February 27, 2015.

2. "I submit this declaration ("Declaration") to assist the Court and other parties in interest in understanding the circumstances that compel the commencement of this Chapter 11 case, and in support of (i) the Debtor's voluntary petition for relief under Chapter 11 of title 11 of the United States Code ("Bankruptcy Code") filed on the date hereof ("Petition Date") and (ii) the relief, in the form of motions, that the Debtor has requested of the Court ("First Day Motions"). I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimum disruption or loss of productivity or value;

1

(b) constitutes a critical element in preserving the value of the estate's assets; and (c) best serves the interests of the Debtor's estate and creditors.

3. "Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. Additionally, I am authorized to submit this Declaration on behalf of the Debtor.

4. "This Declaration is intended to provide a summary overview of the Debtor and this Chapter 11 case.

### A. Events Leading to the Petition Date.

5. "When the Debtor opened its doors on February 14, 2012, it opened the door for the children of El Paso and the surrounding communities to have unprecedented access to high-caliber pediatric care in their own backyard. The Debtor's opening accomplished the largest expansion of pediatric medical care in recent West Texas history, thus filling a void in pediatric care in El Paso that had historically caused infants and children in need of specialized pediatric care to travel to Albuquerque or San Antonio or Dallas or even across the state to Houston to receive treatment from pediatric specialists and sub-specialists. In fact, until the Debtor opened its doors, El Paso was the largest city in the United States without a separately licensed children's hospital. Indeed, in addition to providing desperately needed pediatric care to the region's children, the Plaintiff's opening also attracted high-caliber specialists and subspecialists to El Paso, along with experienced registered nurses and highly trained clinical staff that provide excellent care to the community's children on a daily basis.

6. "Through the present, the Debtor is the only separately licensed, non-taxing, independent, not-for-profit children's hospital in the El Paso region and the only dedicated pediatric hospital within a 250-mile radius of El Paso. Since opening, the Debtor has always operated on the campus of the El Paso Hospital District d/b/a University Medical Center of El Paso ("UMC"). The Debtor is accredited by the Joint Commission, the College of American Pathologists, and the American College of Radiology for magnetic resonance imaging (MRI), and is also recognized as a Quality Respiratory Care Institution by the American Association for Respiratory Care. It is the designated hospital in El Paso County for the Children's Miracle Network.

7. "As an independent, non-profit 501(c)(3) corporation that is governed by a board of directors ("Board"), the Debtor's sole mission is to provide pediatric care to the children of El Paso and surrounding communities. The Debtor's primary operations consist of owning and operating a 122-bed children's hospital in El Paso, Texas.

8. "In response to the desperate need for a pediatric hospital in the region, between 1993 and 2007, various constituencies undertook five separate feasibility studies to assess the feasibility of the formation of a children's hospital in El Paso. To this end, in March of 2007, Thomason Hospital (the former d/b/a of the El Paso Hospital District) engaged Kurt Salmon Associates to prepare a feasibility study (the "2007 Feasibility Study"), the results of which were used to garner the support of the El Paso community for the establishment of a children's hospital in El Paso.

9. "The 2007 Feasibility Study evaluated potential alternatives for the location of the children's hospital and UMC selected the alternative that provided for the children's hospital to be built on its campus, with the funding for such building to come from general obligation bonds.

The 2007 Feasibility Study demonstrated the viability of a children's hospital to be owned and operated by an independent non-profit corporation, based upon a series of assumptions about volume, reimbursement, revenues, expenses, funding sources, and contractual agreements between the children's hospital and UMC.

10. "The 2007 Feasibility Study was presented to the County Commissioners' Court, the Chamber of Commerce, other stakeholders, and the public. It served as the touchstone to generate support necessary to obtain voter approval of general revenue obligation bonds in the amount of $120.1 million, the proceeds of which were to be used to construct and equip a children's hospital (the "Bonds"). El Paso's voters approved the concept of a children's hospital and the issuance of the Bonds in 2008, as direct obligations of UMC, payable from the levy and collection of an ad valorem tax by the El Paso taxpayers.

11. "On or about February 10, 2012—four days prior to the Debtor's opening its doors to patients — UMC and the Debtor entered into a multitude of agreements that document and govern the complex and intertwined relationship between UMC and the Debtor. The agreements include a master agreement, a lease for the space on which the Debtor operates on the UMC campus, several development series and repayment agreements that cover the provision and repayment of working capital, administrative services agreements for the provision of services necessary for the Debtor to operate, ranging from housekeeping and dietary to payroll, accounting, revenue cycle, human resources, equipment lease agreements, and labor service agreements (collectively, the "Agreements").

12. "Many of the terms of the Agreements vary considerably from the structure contemplated by the 2007 Feasibility Study, including (i) assumptions that working capital loans would be repaid over a 5-year period, instead of 18 months, resulting in severe

4

undercapitalization in the startup phase of operations of the Debtor; (ii) a portion of the property tax appropriations attributable to pediatrics (estimated at $3.9 million in 2007 based on 2005 data) would be annually to the Debtor by UMC for relieving UMC of its obligation to provide care for the pediatric indigent population of El Paso County; and (iii) the Debtor would benefit from the efficiencies created by its location on the campus of UMC and sharing services, which was not reflected in the Agreements.

13. "With respect to the efficiencies that were supposed to be created by the location of the Debtor on the UMC campus (at the behest of UMC), the opposite occurred. UMC instead charged the Debtor multiples of its actual costs for myriad services, rent, and ancillary items. These charges were not only above UMC's cost but far more than what the Debtor would pay third-party vendors for equivalent services.

14. "Moreover, UMC obligated the Debtor to utilize its wholly-owned subsidiary managed care company, El Paso First Health Plans, Inc. ("El Paso First") for management of certain managed care programs. Under such programs, El Paso First is required to pay the Debtor in exchange for services it provides to El Paso First enrollees. I believe that El Paso First has significantly underpaid the Debtor for services provided by the Debtor through systematically paying under-market and below-cost rates. Indeed, the Debtor has been obligated to provide services to enrollees in El Paso First's programs at rates around only 11% of billed charges, causing the Debtor to incur severe losses to provide these services at below Debtor's cost.

15. "More than a year after entering into the Agreements, on or about April 11, 2013, UMC and the Plaintiff entered into a Pledge and Security Agreement ("Security Agreement").

16. "On or about May 27, 2014, the Plaintiff's Board determined that it was necessary to cease payments to UMC due under the onerous Agreements. The next day, on May 28, 2014, UMC filed a UCC-1 Financing Statement with the Texas Secretary of State ("UMC Lien").

17. "The Debtor's Board is committed to carrying out its mission to preserve and protect the long-term integrity of pediatric healthcare in the El Paso community. Although the Debtor has struggled financially due to the oppressive weight of UMC's control, and the improvident Agreements, as borne out through the parasitic contracts and financial structure UMC thrust upon it, the Debtor is a part of miracles that happen every day for its patients.

18. "Despite its financial struggles, the Debtor has also achieved great success in attracting high-caliber pediatric specialists to practice pediatric medicine in El Paso. Historically, such was a nearly impossible feat, and indeed, prior to the Debtor's opening, El Paso had only one physician in a given pediatric specialty. This dearth of talent meant that each pediatrician was on call 24/7, resulting in burn out and prompting many specialists to leave El Paso. The Debtor, affiliating with Texas Tech Medical School as a teaching site, has attracted top specialists and sub-specialists to El Paso, thus providing the El Paso community with the best available care to the children in the region who need care in an appropriately equipped and staffed for the pediatric population. Many such specialists and sub-specialists have indicated that they would not be practicing in El Paso if it were not for the opening of the Debtor because practice in a hospital dedicated to the care of only pediatric patients is fundamentally different than practice in any other setting.

**B.     Prepetition Debt**

19. "The Debtor retained the services of AlixPartners, LLP ("Alix") in January 2015 to quantify its sources of illiquidity and the true cost-based accounting of its relationship with

UMC. In particular, Alix reviewed how much UMC overcharged the Debtor and how much El Paso first underpaid the Debtor.

20. "As of September 30, 2014, UMC asserted that it was owed in excess of $81 million from the Debtor. I believe that the amount owed by the Debtor is a fraction of the amount claimed by UMC. I believe that the tangled and codependent relationship between the Debtor and UMC has resulted in a gross distortion of the actual financial condition of the Debtor. An assessment of the Debtor's prepetition financial situation must adjust for the overcharges, underpayments, and the liquidity impairment caused by UMC's and El Paso First's controlling relationship over the Debtor.

21. "On February 26, 2015, due at least in part to UMC's communications with the media in which it asserted exorbitant amounts due to it by the Debtor, Navigant Healthcare Cymetrix Corporation f/k/a Cymetrix Corporation ("Cymetrix"), the new corporate owner of a failed vendor of the Debtor, obtained a prejudgment writ of garnishment against the Debtor over nearly a million dollars in the Debtor's operating funds. The garnishment was obtained in connection with a lawsuit filed by Cymetrix on February 26, 2015 in Denton County, Texas. In the lawsuit, Cymetrix asserted a right to damages against the Debtor, despite its myriad and persistent failures to perform its contractual obligations to the Debtor, including its billing and other accounting services from which the Debtor was to ensure its cash flow and manage payments for its provision of patient care.

C. **Prepetition Attempts at Resolution with UMC**

22. "It is my understanding that as a result of the Debtor's financial situation, in July of 2014, the Debtor and UMC began negotiations to address the disputed amount due to UMC. Negotiations continued throughout 2014 and into the early part of 2015. In a formal attempt to resolve the issues, the Debtor and UMC participated in a mediation on February 17, 2015, with

7

mediator Jim Curtis of Kemp Smith. At that mediation, the Debtor and UMC arrived at an agreement, but the agreement fell apart over a subsequent disagreement concerning one term.

23. "Subsequent to that mediation, UMC released a February 23 Term Sheet to the Debtor as well as the media, with the message that unless the Debtor accepted the February 23 Term Sheet, UMC authorized the termination of certain services to the Debtor. The Debtor responded by issuing a February 25 Term Sheet to UMC, which reflected the agreements reached at the half-day mediation, with two minor changes.

24. "With the dueling term sheets, the Debtor and UMC then engaged in a second round of mediation, but with former Bankruptcy Judge Leif M. Clark. Although the Debtor and UMC reached an agreement on a term sheet at the end of that mediation as well, weeks after the parties walked away from the mediation table, disputes again emerged in the process of UMC conducting due diligence and UMC unilaterally altering key mediated terms concerning the obligation to honor its commitment to pediatric care. The disputes between the Debtor and UMC remained unresolved as of the Petition Date.

**D.      Financial Information**

25. "As of the last audited financials prior to the Petition Date, the Debtor has total assets of approximately $23 million, and total liabilities of approximately $99 million. The Debtor employs approximately 563 people.

**E.      Summary of First Day Motions**

26. "Concurrently with the filing of its Chapter 11 Petition, the Debtor has filed various First Day Motions, all of which the Debtor believes is necessary to enable it to operate in Chapter 11 with minimum disruption. The Debtor respectfully requests that the relief requested in each of the First Day Motions be granted because the relief requested therein is essential to stabilizing and facilitating the Debtor's operations during these Chapter 11 cases, and to promote

the Debtor's chances at reorganization. A description of the relief requested, and the facts supporting each of the First Day Motions is set forth below.

  **ii. Debtor's Emergency Motion for Order (1) Authorizing Continued Use of Existing Business Forms and Records and (2) Authorizing Maintenance of Existing Corporate Bank Accounts.**

  27. "The Debtor seeks approval of its continued use of existing business forms and records, and also authority to maintain their existing corporate bank accounts. In particular, the Debtor seeks authority to continue to maintain its existing bank accounts, have those accounts swept on a regular basis, and the amounts then deposited into a designated debtor-in-possession bank account with Wells Fargo Bank. ("DIP Account"). The Debtor will work with Wells Fargo to facilitate this transaction.

  28. "It is my opinion, that the implementation and enforcement of all of the U.S. Trustee guidelines in this Chapter 11 Case, however, will severely disrupt and derail the ordinary financial operations of the Debtor. Implementing such procedures will entail costly administrative burden and will likely cause confusion to the Debtor's customers. The Debtor respectfully requests authority to continue to seek use of its existing business forms and records, as well as maintain its existing corporate bank accounts. My familiarity with the Debtor's business operations leads me to believe that its continuation, as well as the implementation of the DIP Account as described herein, is essential to the Debtor's ongoing operation and their efforts towards reorganization.

  **iii. Debtor's Emergency Motion for Order Authorizing Payment of Certain Prepetition Wages, Other Compensation, and Reimbursable Employee Expenses**

  29. "The Debtor seeks the authority to pay certain prepetition employee benefits owed to either its employees or those who provide employee benefits, to honor and continue certain employee benefits ("Employee Obligations") and to authorize and direct financial

institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Employment Obligations.

30. "The Employment Obligations include amounts owed to or on behalf of the Debtor's employees for wages, salaries, reimbursement of expenses, and other benefits as described below.

31. "It is my opinion that payment of the Employment Obligations is necessary to the Debtor's success in its bankruptcy case because a failure to pay would have a negative impact on employee morale and could result in a reduction in performance that would be detrimental to the Debtor's business. If the Debtor is not permitted to pay the Employment Obligations, I believe that the Debtor's ability to preserve its business and assets and ultimately be successful in its Chapter 11 case will be adversely affected if it is unable to retain its employees. I therefore believe that it is critical that any hardship and disruption caused by this Chapter 11 proceeding should be minimized in order to preserve morale and maintain the Debtor's workforce. None of the payment amounts exceed the 507(a) priority cap.

    **iv.    Debtor's Emergency Motion Pursuant to 11 U.S.C. § 363 for (1) Authority to Use Cash Collateral in the Ordinary Course; (2) Provide Adequate Protection; and (3) Scheduling Final Hearing**

32. "It is essential for the Debtor to obtain immediate authority to use Cash Collateral. This relief will enable them to continue its ordinary course, day-to-day operations, and also pursue its reorganization goals. It is my belief that without immediate authority to use Cash Collateral, the Debtor may not have sufficient liquidity to provide working capital during the Chapter 11 case to provide its customers, employees, suppliers, and other key constituencies with confident that the Debtor will be able to maintain its operations in the ordinary course of business. Absent authority to use Cash Collateral, I believe that the Debtor's ability to continue its operations might be jeopardized, which centers around, of course, the provision of care to its

pediatric patients. The Cash Collateral Budget shows that the Debtor's operations and collections results in a new cash increase over the life of the Budget period.

33. "The Debtor requests authorization pursuant to §§ 105, 361, 362, and 363, and interim and final orders authorizing the Debtor's use of Cash Collateral. The Debtor requests that the Court authorize the Debtor's use of Cash Collateral under § 363 for ordinary and necessary expenses incurred by the Debtor to operate its business and to maintain, preserve, and protect the Debtor's business in compliance with an Interim Budget. The Debtor also requests that the Court schedule a final hearing for the Court to consider entry of a final order authorizing the Debtor to use Cash Collateral. Upon the final hearing, the Debtor requests approval of a thirteen (13) week budget in the form to be provided to UMC no later than five (5) days prior to the final hearing.

34. "I believe that, if entry of the Interim Order or Final Order is denied or delayed, that the Debtor will likely experience severe business disruptions immediately, which very well could diminish the Debtor's ability to continue to provide patient care. Without immediate authority to use Cash Collateral, in my opinion, the Debtor's business operations will likely stall and the Debtor's chances at success in this Chapter 11 case are diminished."

35. Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief, after reasonably inquiry.

Dated: May 19, 2015.

                                              **El Paso Children's Hospital Corporation**

                                              /s/ Mark Herbers
                                              By: Mark Herbers
                                              Its: Chief Executive Officer & Chief Restructuring Officer