IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| EL PASO CHILDREN'S HOSPITAL | § | |
| CORPORATION | § | CASE NO. 15-30784 |
|     DEBTOR. | § | CHAPTER 11 |
| | § | |
| EIN: 26-3075429 | § | |
| | § | |
| 4845 ALAMEDA AVENUE | § | |
| EL PASO, TEXAS 79905 | § | |
| | § | |
| EL PASO CHILDREN'S HOSPITAL | § | |
| CORPORATION, | § | |
|     PLAINTIFF, | § | |
| | § | ADV. PRO. NO. 15-_____ |
| V. | § | |
| | § | |
| EL PASO COUNTY HOSPITAL | § | |
| DISTRICT D/B/A UNIVERSITY | § | |
| MEDICAL CENTER OF EL PASO, | § | |
|     DEFENDANT. | § | |

## COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, El Paso Children's Hospital Corporation ("Debtor" and/or "Plaintiff"), and files its Complaint and Application for Injunctive Relief against El Paso County Hospital District d/b/a University Medical Center of El Paso ("Complaint") and would show the Court as follows:

### JURISDICTION AND VENUE

1.     This is an adversary proceeding brought by the Debtor as Plaintiff, pursuant to Bankruptcy Rule 7001(1) and (9) and 11 U.S.C. §§ 547 and 548.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 157 and § 1334 in that this is a core proceeding arising under Title 11 of the United States Code (the "Bankruptcy Code") or arising

in or related to a case under the Bankruptcy Code and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").  Venue in this district is proper pursuant to 28 U.S.C. § 1409.

## THE PARTIES

2.     The Plaintiff may be served in this adversary proceeding through the undersigned counsel.

3.     Defendant El Paso County Hospital District d/b/a University Medical Center of El Paso ("UMC" or "Defendant") is a validly existing hospital district created by the Texas Legislature and a political subdivision of the United States of America, with its principal place of business at 4815 Alameda Avenue, El Paso, Texas 79905.  Defendant UMC may be served by delivering a copy of the summons and the complaint to its President and CEO, James N. Valenti, 4815 Alameda Avenue, El Paso, Texas 79905, or pursuant to Federal Rule of Civil Procedure 4(h) by serving any director, officer or agent authorized by law to accept service.

## FACTUAL BACKGROUND

### A.     The Plaintiff's Bankruptcy

4.     On May 19, 2015 ("Petition Date"), the Plaintiff filed its petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this bankruptcy case, and no committee has been appointed or designated.

### B.     Relevant History of the Plaintiff's Creation & UMC's Involvement

5.     When the Plaintiff opened its doors on February 14, 2012, it opened the door for the children of El Paso and the surrounding communities to have unprecedented access to high-

caliber pediatric care in their own backyard. The Plaintiff's opening accomplished the largest expansion of pediatric medical care in recent West Texas history, thus filling a void in pediatric care in El Paso that had historically caused infants and children in need of specialized pediatric care to travel to Albuquerque or San Antonio or Dallas or even across the state to Houston to receive treatment from pediatric specialists and sub-specialists. In fact, until the Plaintiff opened its doors, El Paso was the largest city in the United States without a separately licensed children's hospital. Through the present, the Plaintiff is the only separately licensed, non-taxing, independent, not-for-profit children's hospital in the El Paso region and the only dedicated pediatric hospital within a 250-mile radius of El Paso. Indeed, in addition to providing desperately needed pediatric care to the region's children, the Plaintiff's opening also attracted high-caliber specialists and subspecialists to El Paso, along with experienced registered nurses and highly trained clinical staff that provide excellent care to the community's children on a daily basis.

6.     Because of the desperate need for quality pediatric care in El Paso, between 1993 and 2007, five separate feasibility studies were performed to assess the feasibility of a children's hospital in El Paso. In March of 2007, Thomason Hospital (the former d/b/a of the El Paso Hospital District) engaged Kurt Salmon Associates to prepare one such feasibility study (the "2007 Feasibility Study"), the results of which were used to garner the support of the community for the establishment of a children's hospital in El Paso.

7.     The 2007 Feasibility Study evaluated potential alternatives for the location of the children's hospital and among these options, UMC selected the option under which the children's hospital would be built on UMC's campus. This Feasibility Study was presented to the County Commissioners' Court, the Chamber of Commerce, other stakeholders and the

public, and served as the touchstone to generate support necessary to obtain voter approval of general revenue obligation bonds in the amount of $120.1 million, the proceeds of which were to be used to construct and equip a children's hospital (the "Bonds").

8.      The voters of El Paso approved the concept of a children's hospital for the community and the issuance of the Bonds in 2008 payable from the levy and collection of an ad valorem tax by the taxpayers.

9.      The Plaintiff opened its doors three years ago, on February 14, 2012, located on four floors of a 10-story tower on the campus of UMC, as required under the structure of the Bonds.  As an independent, non-profit 501(c)(3) corporation that is governed by a board of directors ("Board"), the Plaintiff's sole mission is to provide pediatric care to the children of El Paso and surrounding communities.

## C.      The Unusual Relationship Between UMC and the Plaintiff

10.      On or about February 10, 2012—four (4) days prior to the Plaintiff's opening its doors to patients — UMC presented Plaintiff with a multitude of agreements that document and govern the relationship between UMC and the Plaintiff.

11.      Under the structure of the Bonds, UMC created and fostered the creation of the Plaintiff with the promise of being a valuable source of services to enable the Plaintiff to fulfill its mission of providing pediatric care to the El Paso area in an economically feasible way.

12.      By design, the Agreements cover nearly every aspect of the Plaintiff's operations. Consequently, termination of the Agreements would severely undermine, if not destroy, the Plaintiff's ability to provide patient care.

13.     The agreements include a master agreement ("Master Agreement")[1] and a facility lease ("Lease")[2] for the space on which Plaintiff operates on the UMC campus ("Facility"), as well as several development series and repayment agreements that cover the provision and repayment of working capital, administrative services agreements for the provision of services necessary for the Plaintiff to operate, ranging from housekeeping and dietary to payroll, accounting, revenue cycle, human resources, equipment lease agreements, and labor service agreements ("Related Agreements," and together with the Master Agreement and Lease, the "Agreements").  The Agreements were entered into on the eve of Plaintiff's opening at the behest of UMC and have provided the platform from which UMC has exercised control over the Plaintiff.

14.     Many of the salient terms of the Agreements vary considerably from the structure contemplated by the 2007 Feasibility Study that paved way for approval of the Bonds, including (i) assumptions that working capital loans would be repaid over a 5-year period, instead of 18 months, resulting in severe undercapitalization in the startup phase of operations of the Plaintiff; (ii) a portion of the property tax appropriations attributable to pediatrics (estimated at $3.9 million per annum in 2007 based on 2005 data) would be annually paid to the Plaintiff by UMC for relieving UMC of its obligation to provide care for the pediatric indigent population of El Paso County; and (iii) the Plaintiff would benefit from the efficiencies created by its location on the campus of UMC and sharing services, which was not reflected in the Agreements.  The variances in the Agreements from the 2007 Feasibility Study operate to the Plaintiff's detriment, but to UMC's unearned benefit.

---

[1] A true and correct copy of the Master Agreement is attached hereto as Exhibit A.
[2] A true and correct copy of the Facility Lease Agreement ("Lease") is attached hereto as Exhibit B.

15.    Despite the structure contemplated in the 2007 Feasibility Study, UMC has charged the Plaintiff multiples of its actual costs for myriad services, rent, and ancillary items. These UMC charges were not only above cost, but far more than what the Plaintiff would pay third-party vendors for equivalent services.

16.    The following chart ("Services Chart") details particular services for which UMC has either overcharged or underpaid the Plaintiff:

| Overcharge/Underpay Item | Description | Estimated Amount |
|---|---|---|
| *Facility Lease (Overcharge)* | UMC entered into a facility lease with the Plaintiff despite the funding of the Facility with public revenue bonds. UMC coerced the Plaintiff to enter into a $10 million dollar plus per year lease on the promise of government matching funds that did not materialize.  Despite the changed circumstances and the Plaintiff's entreaties, UMC continues to assert the full rental against the Plaintiff. | $27,106,026 |
| *Hospital Services (Overcharge)* | UMC charged the Plaintiff for hospital services well above UMC's cost and above equivalent services from third parties. | $14,297,659 |
| *El Paso First Health Plans, Inc. ("EPF") Reimbursement Rates (Underpayment)* | UMC's caused its wholly owned subsidiary EPF entered into managed care agreement with the Plaintiff that grossly underpaid the Plaintiff for services to its enrollees well below the Plaintiff's cost and well below market reimbursement rates, and at such low rates that the Plaintiff was losing money in providing the services. | $15,750,000 |
| *Avoided Indigent Care Costs (Underpayment)* | The 2007 Feasibility Study proposed for UMC to allocate | More than $12 million |

| Overcharge/Underpay Item | Description | Estimated Amount |
|---|---|---|
| | to the Plaintiff property tax appropriations of approximately $3.9 million per year (to be adjusted for subsequent years) based on the Plaintiff relieving UMC of the obligation to provide indigent pediatric care.  UMC retained the tax allocation despite the Plaintiff providing all pediatric indigent care on UMC's behalf. | |
| *Imaging Equipment Charges* | UMC charged the Plaintiff for use of imaging equipment at Medicare reimbursement rates instead of lower Medicaid reimbursement rates | $1.4 million ($700,000 per year for two years). |
| *UMC Cashier Control (Underpayment)* | UMC's control of shared cashier services allowed UMC to allocate joint UMC/Plaintiff payments solely to UMC (such as mothers paying for delivery/neonatal services). | Unknown |
| *Imbalanced Utility Metering (Overcharge)* | Utilities are not separately metered.  Instead, UMC allocates utilities on a per square foot basis despite UMC's premises being less energy efficient. | Unknown |
| *UMC Neonatal Admissions (Misappropriation)* | UMC routinely admitted neonates contrary to accepted practices prior to transfer to the Plaintiff depriving the Plaintiff of normalized first-day Medicaid revenues. | Unknown |

The Services Chart is not exhaustive, but merely illustrative of the systematic siphoning of funds from the Plaintiff, contrary to the projections and assumptions of the 2007 Feasibility Study.

17.     As further evidence of its unequal bargaining power, UMC largely ignored the Plaintiff's entreaties to remedy those overcharges and underpayments.  For example, on June 20, 2014, the Plaintiff sent notice to UMC invoking §15.23(a) and (b) of the Master Agreement to

the effect that material changes in healthcare funding required adjustment of the amounts due under the Lease[3] and the Related Agreements (as defined in the Master Agreement) ("June 2014 Notice").[4]  UMC completely ignored the Plaintiff's requests, preferring instead to carry a large account receivable on its books that masked its own core operating losses.

**D.     Events Leading to the Plaintiff's Bankruptcy Filing**

18.     Since at least mid-April of 2014, the Plaintiff has had material losses and has been suffering from a lack of liquidity. The Plaintiff's liquidity issues stem directly from UMC's systemic and calculated practice of overcharging the Plaintiff in connection with the Agreements. UMC has had knowledge of the Plaintiff's material operating losses and its lack of liquidity since at least 2013.[5]

19.     Further, in the June 2014 Notice, the Plaintiff specifically invoked a provision of the Master Agreement that permits the parties to review the terms of the Agreements following their effective date to determine whether the particular agreement is meeting the parties' reasonable expectations and to correspondingly amend the agreements if not, to no avail.  *See* Ex. A, Master Agreement § 15.23(a) & (b).   In the June 2014 Notice, the Plaintiff formally invoked such provision with UMC given the Plaintiff's financial distress, stemming from the amount UMC proffered as due to it from the Plaintiff and the Plaintiff's belief that in light of the services and space actually provided by UMC to the Plaintiff, the amount outstanding should be less.  *See*  Ex. C.  Obviously, UMC has had knowledge that Plaintiff's financial distress is a

---

[3]   UMC proposed the Lease to take advantage of certain inter-governmental transfer funding (which did not materialize), not in compensation for its actual costs because the premises occupied by the Plaintiff *was already funded through the taxpayer revenue bonds.*

[4] A true and correct copy of the June 20, 2014 correspondence from Plaintiff to UMC in which Plaintiff invokes§ 15.23(a) & (b) of the Master Agreement is attached hereto as Exhibit C.

[5] A true and correct copy of the Agreement on Obligations between the Plaintiff and UMC dated February 1, 2013 is attached hereto as Exhibit D.

direct consequence of the amounts that UMC asserts is owed by the Plaintiff related to the Agreements.

20.     More than a year after entering into the Agreements, on or about April 11, 2013, UMC and the Plaintiff entered into a Pledge and Security Agreement ("Security Agreement").[6]

21.     On or about May 27, 2014, the Plaintiff's Board determined that it was necessary to cease payments to UMC due under the Agreements due to lack of liquidity and insolvency. The *very next day*, on or about May 28, 2014, UMC filed a UCC-1 Financing Statement with the Texas Secretary of State ("UMC Lien").[7]  The Plaintiff was insolvent at the time of the filing of the UMC Lien. Item number 3 of the UMC Lien identifies the secured party as UMC.  Exhibit C-1 attached to the UMC Lien lists various assets as the "Collateral."  *See* Ex. E.  UMC knew that the Plaintiff was insolvent at the time of the filing of the UMC Lien.

22.     The Plaintiff believed (and still believes) that its financial circumstances would drastically improve if the terms of the Agreements aligned with actual costs, or even at worst, market rates, for such services from UMC.

23.     In July 2014, motivated by the Plaintiff's financial distress, UMC and the Plaintiff began negotiations concerning the payable due to UMC from Plaintiff.  In the course of such negotiations, UMC presented itself as a potential strategic partner to the Plaintiff, with whom the Plaintiff could retain its goal of maintaining the Plaintiff's operations as a separately licensed, non-profit children's hospital, with a separate board and a separate medical staff focused on its mission of providing high quality pediatric specialty and sub-specialty care.

24.     The Plaintiff's Board approved terms upon which it would allow UMC to take control of the Plaintiff, but the Plaintiff soon discovered that UMC intended to fundamentally

---

[6] A true and correct copy of the Pledge and Security Agreement between the Plaintiff and UMC is attached hereto as Exhibit E.

[7] A true and correct copy of the UMC Lien is attached hereto as Exhibit F.

alter the structure of the Plaintiff's board into a sole corporate member structure, with UMC holding extensive reserve powers and requiring certain reporting requirements. The Plaintiff believed (and still believes) that such structure is fundamentally incompatible with the continuation of the Plaintiff's sole mission to provide quality pediatric care to the children of El Paso and surrounding communities via a separately licensed children's hospital.

25.     On or about January 2015, after Plaintiff approved most of the revisions from UMC, with the exception of one term, the agreement fell apart.

26.     On or about February 2, 2015, UMC provided a proposed term sheet to the Plaintiff that included terms additional to the prior failed agreement.

27.     On or about February 11, 2015, UMC told the Plaintiff that if it did not receive a response to the February 2 term sheet within two days, it would contemplate terminating the Agreements.

28.     Faced with the threat of UMC's termination of the Agreements, which represent the lifeline to necessary services for the provision of patient care, the Plaintiff arranged for a mediation between the parties with mediator Jim Curtis of Kemp Smith LLP.

29.     On February 17, 2015, UMC and the Plaintiff participated in a half-day mediation with Mr. Curtis that nearly resulted in an agreement. The Plaintiff requested that the mediation be continued, but UMC declined the invitation to continue to mediate.

30.     On February 23, 2015, UMC presented the Plaintiff (as well as the El Paso media) with another term sheet. The February 23 term sheet contained new terms not previously discussed.

31.     On February 24, 2015, while the Plaintiff's Board was meeting to discuss the February 23 term sheet, it received a 30 days' notice of termination of certain services from

UMC ("Notice of Cessation").  In the Notice of Cessation, UMC asserted that the Administrative Services Agreement entered into between the parties on February 12, 2012 (the "Services Agreement") "expired on its own terms on September 30, 2014."[8] Contrary to UMC's assertions in the Notice of Cessation, the parties had previously executed an amendment dated September 19, 2014, which revised the rates and scope of contracted services effective as of fiscal year 2015 (*i.e.* October 1, 2014) ("September 19 Amendment").[9]

32.     Among other things, the Notice of Cessation was ineffective, however, to terminate the Services Agreement because the Services Agreement requires 90 days' prior written notice for termination without cause of any contracted services.  *See*  Ex. G, § 5.3.2, p. 3. In addition, sections 5.3.2 and 5.4 of the Services Agreement require compliance with the dispute resolution process delineated in Article 15 thereof prior to the termination of any services specifically because of the express acknowledgement by both UMC and the Plaintiff that "the *termination* of any of the Services *may have an adverse effect on the care of patients admitted to EPCH's hospital* or on EPCH's financial performance."  *See*  Ex. G, § 5.4, p. 3 (emphasis added).

33.     Moreover, UMC and the Plaintiff had continued to operate under the terms of the Services Agreement through the present.  Accordingly, the Notice of Cessation was ineffective to terminate the Services Agreement or any of the Agreements, which remained effective up through and including the Petition Date.

34.     On February 25, 2015, the Plaintiff provided UMC with a term sheet reflective of the agreement reached at the half-day mediation.

---

[8] A true and correct copy of the Services Agreement is attached hereto as Exhibit G.
[9] A true and correct copy of the September 19 Amendment is attached hereto as Exhibit H.

35.     The parties then participated in a full-day mediation with former Bankruptcy Judge Leif Clark, and reached an agreement.  During UMC's due diligence period in connection with the agreement, however, disputes emerged, including UMC's unilateral alteration of key, heavily mediated terms.

36.     Despite extensive negotiations for nearly a year and participation in two mediations, a resolution of the disputes between UMC and the Plaintiff never materialized, necessitating the Plaintiff's bankruptcy filing.

## COUNT 1: AVOIDANCE OF LIEN—11 U.S.C. § 547

37.     The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

38.     The UMC Lien was a transfer of an interest of the Plaintiff in property to or for the benefit of UMC, a creditor of the Plaintiff.  *See* Ex. F.

39.     UMC is a creditor of the Plaintiff because, among other things, UMC is owed outstanding amounts by the Plaintiff pursuant to the Agreements.

40.     The UMC Lien was for or on account of an antecedent debt owed by the Plaintiff before the UMC Lien was filed.

41.     The debt owed by the Plaintiff to the Defendant UMC arose prior to May 28, 2014, as it arose on or about February 10, 2012, about the time the parties entered into the Agreements.

42.     The UMC Lien was made while the Plaintiff was insolvent.

43.     The UMC Lien was made between ninety days and one year before the date of the filing of the Petition to an insider.  *See* Ex. F.

44.     The UMC Lien was made on May 28, 2014, and the Petition Date was May 22, 2015.  *See* Ex. F.

45.     The Defendant UMC is an "insider" of the Plaintiff within the meaning of
§ 547(b)(4)(B).  *See, e.g., In re Think3 Litig. Trust v. Zuccarrello (In re Think3, Inc.),* No. 13-
1081, 2015 Bankr. LEXIS 20, at * 74-78 (Bankr. W.D. Tex. Jan. 4, 2015) (citing *Browning
Interests v. Allison (In re Holloway),* 955 F.2d 1008, 1011 (5th Cir. 1992) (finding that several
facts demonstrated the closeness of the relationship that could support a finding that the creditor
was a non-statutory insider, including the nature of the parties' relationship, the frequent contact
between the parties, the creditor's knowledge of the debtor's insolvency, and the unusual
circumstances concerning the loan).  UMC was an insider at the time the UMC Lien was made.

46.     The Plaintiff and UMC have had a codependent relationship since 2012—since
the Plaintiff's inception and throughout its entire operations to date.  *See id.; See In re Applegate
Property, Ltd.,* 133 B.R. 827, 832 (Bankr. W.D. Tex. 1991) (examining whether a related entity
constituted a non-statutory insider for the purpose of determining votes for confirmation and
noting that the related entities were "structured under a fairly complicated arrangement" and that
"the association could be viewed as one operating unit."); *Anstine v. Carl Zeiss Meditec AG (In
re U.S. Medical, Inc.),* 531 F.3d 1272, 1280 (10th Cir. 2008) (noting that evidence of control or
influence exercised by a purported insider supports a finding of non-statutory insider); *Sarachek
v. Cohen (In re Agriprocessors, Inc.),* No. 10-09197, 2013 Bankr. LEXIS 4401, at *12-14
(Bankr. N.D. Iowa Oct. 21, 2013) (finding the existence of control based upon the length and
closeness of the parties' relationship, frequent communication between the parties, frequent
association with respect to day-to-day business activities, and an absence of commercial
motivation).

47.     UMC caused the Plaintiff to be formed and UMC appointed two of the Plaintiff's
initial board members.  Both UMC's Chief Executive Officer and Chief Financial Officer serve

on the Plaintiff's Board as *ex officio* members.  In addition, UMC's current board member, Steve Degroat, served on the Plaintiff's Board as a voting member from May 2009 through October 2011.

48.      Nearly all of the Plaintiff's operations are conducted based upon or related to the Agreements with UMC.

49.      UMC presented the Plaintiff with the Master Agreement, the Lease, and the Related Agreements less than *one week* of the Plaintiff's scheduled opening, leaving the Plaintiff with no time and no independence to negotiate any of those agreements at arms' length.

50.      Subsequent to the Plaintiff's opening, many of UMC's employees transferred to the Plaintiff, and UMC caused the Plaintiff to take on UMC's accrued liabilities for those employees such as retirement plans, accrued vacation, and accrued bonuses.

51.      UMC knows that its termination of the Agreements would almost immediately operate to severely undermine—if not completely eradicate—the Plaintiff's ability to continue to provide patient care.

52.      The Shared Services as defined in the Master Agreement are all purchased by and controlled by UMC and therefore UMC unilaterally allocates costs to the Plaintiff.  *See* Ex. A.

53.      UMC controls the only kitchen in the entire hospital complex and unilaterally allocates dietary services to the Plaintiff.

54.      UMC controls the only receiving dock in the entire hospital complex.

55.      UMC controls all information technology services and unilaterally allocates costs to the Plaintiff, and withholds necessary assistance, maintenance, and quality.

56.      UMC controls all telecommunication equipment and unilaterally allocates costs to the Plaintiff.

57.     UMC controls plant management and unilaterally allocates costs to the Plaintiff.

58.     UMC controls operating room instrument sterilization facilities.

59.     UMC controls medical gas storage tanks.

60.     UMC controls environmental services, laundry, and housekeeping services.

61.     UMC controls biomedical engineering labs.

62.     UMC controls the Plaintiff's payroll services.

63.     Through the Lease, Master Agreement, and Related Agreements, all presented by UMC to the Plaintiff less than one week prior to opening, UMC imposed above-market, above-cost charges that bear no rational relationship to the value of services provided.

64.     The Lease, in particular, calls for rent of over $10 million per year and over $335 million over the life of the non-cancelable lease. UMC did not fund the construction of the Facility. Rather, the Facility was constructed with taxpayer revenue bonds of $120.1 million. UMC represented to the Plaintiff that the Lease would result in the Plaintiff receiving intergovernmental transfer funds, which did not materialize. Despite the change in circumstances, and the Plaintiff's invocation of the Master Agreement's force majeure clause in § 15.23(a) and (b), UMC continues to charge EPCH for this gratuitous obligation.

65.     UMC has used and continues to use the out-sized debt and its physical and operational control to control the Plaintiff. For example, UMC proposed to cutoff services to the Plaintiff via letter from Jim Valenti to James Sexton on February 24, 2015, unless the Plaintiff agreed to "accept the terms set forth in the Term Sheet submitted . . . on February 23, 2015 by no later than 5:00 p.m. on Friday, February 27, 2015." The Term Sheet called for the surrender of control of the Debtor to UMC with no corresponding binding obligation by UMC to do anything.

66. The transactions between the Plaintiff and UMC since the Plaintiff's inception, including in particular, the Agreements, have not been arm's length transactions. It is well established that a creditor may be a non-statutory insider of a debtor when the creditor's transaction of business with the debtor is not at arm's length. *See* 2 COLLIER ON BANKRUPTCY ¶ 1.01(31) (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *Anstine,* 531 F.3d at 1279-80 (10th Cir. 2008) (remarking that "a non-statutory insider who has engaged in a less-than-arms'-length transaction fits just as well into the Bankruptcy Code provisions as a per se insider"); *In re Think3 Litig. Trust,* 2015 Bankr. LEXIS 20, at *75 (noting that the Fifth Circuit examines two factors in determining whether a creditor is a "non-statutory insider," including "whether the transactions between the transferee creditor and the debtor were conducted at arm's length") (citing *Browning Interests v. Allison (In re Holloway),* 955 F.2d 1008, 1011 (5th Cir. 1992); *Sarachek v. Cohen (In re Agriprocessors, Inc.),* No. 10-09197, 2013 Bankr. LEXIS 4401, at * 12 (N.D. Iowa Oct. 21, 2013) (stating that several factors indicate insider status, "many of which relate directly to whether the transfer was for an arm's length transaction") .

67. UMC has exercised control or undue influence over the Plaintiff and its operations since the Plaintiff's inception.

68. UMC has used the threat of unilaterally terminating the Agreements in effort to coerce a UMC takeover of the Plaintiff on UMC's terms, which do not preserve the Plaintiff's sole mission—the maintenance of the Plaintiff as a separately licensed, non-profit children's hospital.

69. The Agreements between the Plaintiff and UMC relate to nearly every aspect of the Plaintiff's operations and were entered into by the Plaintiff at the behest of UMC. Although the 2007 Feasibility Study demonstrated that a commercial relationship between UMC and the

children's hospital for the provision of services could be healthy and promote the growth of both UMC and the subject children's hospital, the onerous terms imposed by UMC in the Agreements have served only to plague and suffocate the Plaintiff financially.  Indeed due to the fact that the Agreements cover nearly every aspect of the Plaintiff's operations, UMC and the Plaintiff could be seen as an operating unit.  As UMC knows, without the provision of services provided by UMC pursuant to the Agreements, the Plaintiff's ability to provide patient care is severely handicapped, if not entirely disabled.

70.     The UMC Lien was created more than a year after the Security Agreement, which itself was entered into a year after the Agreements were signed.  *See* Exs. E & F.  The UMC Lien was created the *very next day* after the Plaintiff's Board determined that it was necessary to cease payments due to UMC under the Agreements.  *See* Ex. F.

71.     UMC and the Plaintiff have had frequent, ongoing contact concerning myriad matters, including the Plaintiff's financial circumstances, since the Plaintiff's inception.

72.     At the time the UMC Lien was made, UMC knew of the Plaintiff's insolvency. The circumstances of the UMC Lien were commercially unusual.

73.     UMC's motivations with respect to its dealings with the Plaintiff are not aligned with a garden-variety creditor.  UMC's motivations revolve around taking control over the Plaintiff on UMC's terms without accounting to the tax payers or EPCH's other creditors.

74.     The UMC Lien enables UMC to receive more than it would otherwise receive if the Plaintiff's bankruptcy case were a case under chapter 7 of the Bankruptcy Code; the UMC Lien had not been made; and UMC received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

## COUNT 2:    FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)

75.     The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

76.     The Plaintiff asserts its claims under 11 U.S.C. § 548(a) against UMC.  The UMC Lien was a transfer of an interest of the Plaintiff in property made within two years of the Petition Date.  The Agreements represent obligations incurred by the Plaintiff on or within two years before the Petition Date.

77.     UMC filed the UMC Lien during the two years prior to the Petition Date.  *See* Ex. F.  As set forth above, the Defendant was an insider at the time it obtained the UMC Lien and at the time that the Plaintiff incurred the obligation of the Agreements.  The UMC Lien was made for the benefit of UMC.  The Agreements were obligations of the Plaintiff made for the benefit of UMC.

78.     Pursuant to § 548(a)(1)(A), the UMC Lien was filed with actual intent to hinder, delay, or defraud an entity to which the Plaintiff was indebted on the date of the UMC Lien.

79.     Pursuant to § 548(a)(1)(A), the Agreements are obligations that were extracted from the Plaintiff by UMC, and were taken on by the Plaintiff for inadequate consideration.

80.     Pursuant to § 548(a)(1)(A), the Agreements are obligations incurred by the Plaintiff with actual intent to hinder, delay, or defraud an entity to which the Plaintiff was indebted on the date the Plaintiff incurred the obligations in the Agreements.

81.     As to both the UMC Lien and the Agreements, there existed at the time of the UMC Lien and at the time the Agreements were entered into, an unusually close relationship between UMC and the Plaintiff.

82.     No new consideration was received by the Plaintiff for the UMC Lien.

83.     The Agreements represent obligations incurred by the Plaintiff in exchange for goods and services that were grossly overstated and overpriced by UMC.

84.     The UMC Lien was conveyed only one day after the Plaintiff's Board determined that it was necessary to cease payments to UMC due under the Agreements. *See* Ex. F.

85.     The Plaintiff was insolvent on the date of the filing of the UMC Lien, or became insolvent as a result of the filing of the UMC Lien.

86.     Alternatively, pursuant to § 547(a)(1)(B), the Plaintiff was insolvent on the date of the Agreements, or became insolvent as a result of its obligations under the Agreements.

87.     At the time of the filing of the UMC Lien, and the incurrence of the obligations under the Agreements, the Plaintiff was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with the Plaintiff was unreasonably small capital.

88.     At the time of the filing of the UMC Lien, and the incurrence of the obligations represented by the Agreements, the Plaintiff intended to incur, or believed it would incur, debts that would be beyond the Plaintiff's ability to pay as such debts matured; or made such transfer to or for the benefit of an insider.

89.     The UMC Lien was made for the benefit of UMC, an insider, and not in the ordinary course of business.

90.     The Agreements were incurred by the Plaintiff for the benefit of an insider and not in the ordinary course of business.

### COUNT 3:     RECOVERY OF AVOIDED TRANSFERS-11 U.S.C. § 550

91.     The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

92.     Section 550 of the Bankruptcy Code allows the Plaintiff, as debtor-in-possession to recover, for the benefit of the estate, the property transferred and avoided under §§ 547 and 548 from the initial transferee of such transfer or the entity for whose benefit such transfer was made. *See* 11 U.S.C. § 550(a).

93.     The Plaintiff is entitled to avoid the UMC Lien pursuant to §§ 547(b) and 548 as set forth herein; thus the Plaintiff is entitled to recovery under § 550.

### COUNT 4:     DISALLOWANCE OF CLAIM PURSUANT TO 502(d)

94.     The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

95.     UMC is a transferee of transfers avoidable pursuant to § 547 of the Bankruptcy Code and a person from whom property is recoverable under § 550 of the Bankruptcy Code.

96.     UMC has not paid the amount for which UMC is liable pursuant to § 550 of the Bankruptcy Code.

97.     Pursuant to § 502(d), any and all claims of UMC against the Plaintiff in its bankruptcy case must be disallowed until such time as UMC pays to the Plaintiff an amount equal to the avoided transfers, plus interest thereon, and costs.

### COUNT 5:     INJUNCTIVE RELIEF

98.     The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

99.     The Plaintiff seeks a temporary restraining order and injunctive against UMC to enjoin any and all attempts by UMC to terminate any and all of the Agreements.

100.    The Plaintiff is entitled to such relief pursuant to 11 U.S.C. § 105, Rule 65 of the Federal Rules of Civil Procedure, made applicable to this proceeding via Rule 7065 of the

Bankruptcy Rules and Bankruptcy Rule 7001(7).  In determining the proprietary of a preliminary injunction, courts evaluate the following factors: (1) whether there is a substantial likelihood that the movant will prevail on the merits; (2) whether there is a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) whether the balance of harm tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction. *In re Zale,* 62 F.3d 746, 752 (5th Cir. 1995).

101.    A temporary restraining order is properly granted to preserve the status quo and prevent immediate and irreparable injury pending a hearing upon a motion for preliminary injunction.  *See Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.),* No. 06-1528, 2006 WL 1529357, at *1 (Bankr. S.D.N.Y. June 5, 2006).  Bankruptcy Rule 7065 provides that a court should issue a temporary restraining order when the moving party establishes that (1) failure to issue the temporary restraining order would result in immediate and irreparable injury, loss, or damage, and (2) expedited relief is necessary with limited or no notice.  *See* FED. R. BANKR. P. 7065(b); *see also Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines, Inc.)*, 107 B.R. 832, 835 n.4 (Bankr. S.D.N.Y. 1989).

102.    If a temporary restraining order and temporary injunction are not granted, harm is imminent because UMC has already attempted to terminate the Agreements despite the indisputable fact that termination without cause can only occur after 90 days' prior written notice for any of the contracted services.  *See*  EX. G, § 5.3.2, p. 3.  In addition, termination cannot occur without invocation of the dispute resolution process contained in the Services Agreement. *See* Ex. G, 5.3.2 and 5.4, p. 3.  Thus, there is a substantial likelihood that the Plaintiff will prevail on the merits of any attempt by UMC to assert that the Agreements terminated prior to the

Petition Date.  Moreover, there is no dispute that termination of the Agreements puts children's lives in jeopardy—both UMC and the Plaintiff expressly acknowledged such in the Services Agreement, which provides that "the ***termination*** of any of the Services ***may have an adverse effect on the care of patients admitted to EPCH's hospital*** or on EPCH's financial performance."  *See*  Ex. G, § 5.4, p. 3 (emphasis added).  Thus, the balance of harm tips dramatically in favor of the Plaintiff due to the threat to its ability to deliver care to its pediatric patients.  The public interest in the ability of the Plaintiff to continue to provide care to its patients also decidedly weighs in favor of the requested injunction.  Moreover, granting the injunction will cause minimal harm to UMC, if any.

103.    As stated, although any pre-petition termination effort on the part of UMC was of no effect, and the Agreements remain effective as of the Petition Date, because of UMC's pre-petition threats and attempts to terminate the Agreements, however, and due to the fact that the Agreements are the Plaintiff's lifeline to services crucial to providing care to its patients, any effort by UMC to terminate the Agreements will result in irreparable injury to the Plaintiff.  Unless UMC is restrained as requested herein, the Plaintiff will also suffer loss of goodwill and reputation if its ability to provide patient care is disrupted.  Moreover, granting the requested injunction will facilitate the Plaintiff's efforts to stabilize its operations toward confirming a chapter 11 plan. *See In re Seatco, Inc.,* 257 B.R. at 478 (recognizing that the "public interest" element for issuance of an injunction is satisfied when the injunction facilitates reorganization, which is in the public interest).  Accordingly, the Plaintiff asks the court for a temporary restraining order and temporary injunction against UMC from taking any and all actions related to any and all attempts to terminate any of the Agreements pending resolution of this adversary proceeding.

104.    The imposition of a temporary restraining order is similarly warranted because of the risk that UMC will seek to terminate the Agreements.  Absent entry of the requested temporary restraining order, the Debtor's ability to provide care to its patients will be threatened as well as its ability to stabilize its operations through this chapter 11 proceeding.  Application of the temporary restraining order to UMC is thus critical to maintenance of the status quo pending resolution of this adversary proceeding.

<b>COUNT 6:    DECLARATORY JUDGMENT</b>

105.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

106.    The Declaratory Judgment Act, codified in 28 U.S.C. § 2201, provides in relevant part:

> (a)    In a case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

107.    As discussed above, the Plaintiff and UMC are parties to the Agreements, which cover nearly all of the services that Plaintiff needs to operate and provide patient care.  The Agreements also include the Lease. *See* Ex. B.

108.    Pursuant to the Lease, the Plaintiff leases space on the UMC campus as a tenant of UMC (as herein defined, the "Facility").  *See*  Ex. B, § 1.1.  The Lease provides that it is for a term of three hundred and sixty (360) months.  *See* Ex. B, § 1.3.  The Lease further obligates the Plaintiff to make rental payments to UMC.  *See* Ex. B, §§ 1.5; 3.1.  The Lease obligates the Plaintiff to make base rent payments for the first three years of $10,326,105.00 per year or $860,508.75 per month for the Facility.  *See* Ex. B, § 1.5.  The Lease further obligates the

Plaintiff to pay additional rent, to include the costs of utilities, as well as "all costs and expenses incurred by [UMC] with respect to the ownership, maintenance and operation of the Building and Common Areas." *See* Ex. B, § 3.3.1. The Lease obligates the Plaintiff to pay, as additional rent, such items or services including, building maintenance, repair, and replacement of the Building, parking lots, sidewalks, and other Common Areas, services contracts for the mechanical, electrical, and elevator systems, and amounts paid to contractors and subcontractors for the foregoing work or services. *See* Ex. B, § 3.3.1(1)-(5). Notably, the Lease obligates the Plaintiff to pay these amounts notwithstanding that the Plaintiff's provision of services to El Paso's indigent pediatric population, which may (and should) constitute adequate consideration.

109. The Lease heaps such overpriced rental obligations on to the Plaintiff despite the fact that the Facility represents the Plaintiff's portion of the hospital premises that was fully funded by $120.1 million in public bond proceeds for the Plaintiff to provide pediatric services to the El Paso community. As set forth above, the 2007 Feasibility Study evaluated alternatives for the location of a potential children's hospital in El Paso, and UMC chose the specific option under which the future children's hospital would be built on its campus. The voters of El Paso approved the concept embodied in the 2007 Feasibility Study and the Bonds so that the El Paso community would receive the benefit of having a children's hospital to be located on the UMC campus.

110. Notwithstanding the fact that the Leased Premises was fully funded via the Bonds based upon the concept *sold to El Paso taxpayers*, UMC has demanded overpriced rental payments from the Plaintiff under the Lease, since the Plaintiff's inception, which constitute excessive consideration. *See* Ex. B, § 2.15 (providing for a "Rent Commencement Date" of

- 24 -

February 1, 2012).  As set forth above, UMC has charged the Plaintiff for rent not only for use of the Facility, but also for its "share" of maintenance of the Facility.  *See*  Ex. B, § 3.3.1.

111.    Thus, an actual controversy exists between the Plaintiff and UMC concerning Plaintiff's right to occupy and use the Facility free of overpriced rental charges that are higher than "the required" adequate consideration for the Facility.

112.    Based on the above, the Plaintiff seeks a declaration from this Court pursuant to 28 U.S.C. § 2201 that: (i) UMC has no right to collect overpriced rental payments in connection with the Plaintiff's use of the Facility; (ii) the Plaintiff has a right to use the Facility because of the Bonds for payment of only adequate consideration; and (iii) the Plaintiff is due a refund of all rental payments made to UMC above and beyond statutory adequate consideration for use of the Facility.

## COUNT 7: DECLARATORY JUDGMENT UNDER
## TEX. CIV. PRAC. & REM. CODE § 37.003

113.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

114.    The Texas Declaratory Judgment Act, at TEX. CIV. PRAC. & REM. CODE § 37.003(a), provides in relevant part:

> A court of record within its jurisdiction has the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.  An action or proceeding is not open to objection on the ground that a declaratory judgment or decree is prayed for.

115.    As discussed above, the Plaintiff and UMC are parties to the Agreements, which cover nearly all of the services that Plaintiff needs to operate and provide patient care.  The Agreements also include the Lease.  *See* Ex. B.

116.     Pursuant to the Lease, the Plaintiff leases space on the UMC campus as a tenant of UMC (as defined herein "Facility").  *See*  Ex. B, § 1.1.  The Lease provides that it is for a term of three hundred and sixty (360) months.  *See*  Ex. B, § 1.3.  The Lease further obligates the Plaintiff to make rental payments to UMC.  *See* Ex. B, §§ 1.5; 3.1.  The Lease obligates the Plaintiff to make base rent payments for the first three years of $10,326,105.00 per year or $860,508.75 per month for the Facility.  *See* Ex. B, § 1.5.  The Lease further obligates the Plaintiff to pay additional rent, to include the costs of utilities, as well as "all costs and expenses incurred by [UMC] with respect to the ownership, maintenance and operation of the Building and Common Areas."  *See*  Ex. B, § 3.3.1.  The Lease obligates the Plaintiff to pay, as additional rent, such items or services including, building maintenance, repair, and replacement of the Building, parking lots, sidewalks, and other Common Areas, services contracts for the mechanical, electrical, and elevator systems, and amounts paid to contractors and subcontractors for the foregoing work or services.  *See* Ex. B, § 3.3.1(1)-(5).   Notably, the Lease obligates the Plaintiff to pay these amounts notwithstanding that the Plaintiff's provision of services to El Paso's indigent pediatric population, which may (and should) constitute adequate consideration.

117.     The Lease heaps such overpriced rental obligations on to the Plaintiff despite the fact that the Facility represents the Plaintiff's portion of the hospital premises that was fully funded by $120.1 million in public bond proceeds for the Plaintiff to provide pediatric services to the El Paso community.  As set forth above, the 2007 Feasibility Study evaluated alternatives for the location of a potential children's hospital in El Paso, and UMC chose the specific option under which the future children's hospital would be built on its campus.  The voters of El Paso approved the concept embodied in the 2007 Feasibility Study and the Bonds so that the El Paso

community would receive the benefit of having a children's hospital to be located on the UMC campus.

118.     Notwithstanding the fact that the Facility was fully funded via the Bonds based upon the concept *sold to El Paso taxpayers*, UMC has demanded overpriced rental payments from the Plaintiff under the Lease, since the Plaintiff's inception that constitute excessive consideration.  *See* Ex. B, § 2.15 (providing for a "Rent Commencement Date" of February 1, 2012).   As set forth above, UMC has charged the Plaintiff for rent not only for use of the Facility, but also for its "share" of maintenance of the Facility. *See*  Ex. B, § 3.3.1.

119.     Thus, an actual controversy exists between the Plaintiff and UMC concerning Plaintiff's right to occupy and use the Leased Premises free of overpriced rental charges that are higher than adequate consideration for the Leased Premises.

120.     Based on the foregoing, the Plaintiff seeks a declaration from this Court pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003(a), that: (i) UMC has no right to collect overpriced rental payments in connection with the Plaintiff's use of the Facility; (ii) the Plaintiff has a right to use the Facility because of the Bonds for payment of only adequate consideration; and (iii) the Plaintiff is due a refund of all rental payments made to UMC above and beyond adequate consideration for use of the Facility.

121.     Moreover, pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009, the Plaintiff is entitled to its reasonable and necessary attorneys' fees as are equitable and just.  An award of the Plaintiff's reasonable and necessary attorneys' fees is proper and appropriate under the facts in this matter, as UMC has, since the Plaintiff's inception, charged the Plaintiff rent for use of the Leased Premises that was already paid for by the Bonds and which the Plaintiff correspondingly should be permitted to use rent-free.

## PRAYER

WHEREFORE, PREMISES CONSIDERED the Plaintiff requests that the Court:

a.   Enter judgment against the Defendant UMC, and that the Court declare that the UMC Lien is avoided pursuant to §§ 547 and 548 of the Bankruptcy Code;

b.   Award Plaintiff its reasonable fees' and costs in bringing this action and the interest that has accrued since Plaintiff's first demand;

c.   Enter an order enjoining and restraining the Defendant UMC and all other persons or entities acting in concert with it, from taking any action to terminate the Agreements pending the resolution of this adversary;

d.   Enter an order to temporarily restrain the Defendant UMC from taking any action to terminate the Agreements pending a hearing and ruling on the granting of a preliminary injunction;

e.   Declare that (i) UMC has no right to collect rental payments in connection with the Plaintiff's use of the Facility; (ii) the Plaintiff has a right to use the Facility rent free because of the Bonds; and (iii) the Plaintiff is due a refund of all rental payments made to UMC;

f.   Award the Plaintiff its reasonable and necessary attorneys' fees pursuant to TEX. CIV. PRAC. REM. CODE § 37.009; and

g.   Grant the Plaintiff such additional relief as the Court deems just and appropriate.

Dated: May 19, 2015.

Respectfully submitted,

JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 - FAX


By: /s/ Patricia B. Tomasco
　　Patricia B. Tomasco
　　State Bar No. 01797600
　　(512) 236-2076 – Direct Phone
　　(512) 691-4438 – Direct Fax
　　Email address:  ptomasco@jw.com

　　Jennifer F. Wertz
　　State Bar No. 24072822
　　(512) 236-2247 – Direct Phone
　　(512) 391-2147 – Direct Fax
　　Email address: jwertz@jw.com


**COUNSEL FOR PLAINTIFF**